IN THE UNITED STATES DISTRICT COURT FOR THE
                          EASTERN DISTRICT OF VIRGINIA
                              Alexandria Division


GOVERNMENT EMPLOYEES            )
INSURANCE COMPANY,              )
                                )
        Plaintiff,              )
                                )
                                )
        v.                      )      No. 1:04cv507
                                )
                                )
GOOGLE, INC., ET AL.,           )
                                )
        Defendants.             )



                            MEMORANDUM OPINION

I.    Introduction

        This Opinion explains in more detail the Court's decision on

the liability issues tried to the bench on plaintiff Government

Employees Insurance Company's ("GEICO") Complaint against

defendant Google, Inc. ("Google").[1]  Plaintiff claims that Google

_____

        [1] The original Complaint was filed on May 4, 2004, against
Google and Overture Services, Inc. ("Overture").  A First Amended
Complaint was filed on May 14, 2004, and on November 29, 2004,
Overture was dismissed as a defendant.  Therefore, all references
to the Complaint in this Opinion are to the First Amended
Complaint, and only Google remains as a defendant.
        In a previous Memorandum Opinion discussed more fully
below, the Court dismissed Google's Motion to Dismiss in part,
finding that Google did "use" plaintiff's trademark for purposes
of the Lanham Act, although not necessarily improperly.   The
Court granted defendant's Motion To Dismiss state law counts of
tortious interference with prospective economic advantage and
statutory civil business conspiracy and denied the Motion to the
extent that it sought a ruling that Google did not "use"
plaintiff's trademark.  See Gov't Employees Ins. Co. v. Google,
Inc., 330 F. Supp. 2d 700 (E.D. Va. 2004).

violates the Lanham Act and engages in unfair competition under state law by using GEICO's trademarks[2] to sell advertising on its Internet search engine.  Specifically, the Complaint alleges (1) direct, contributory and vicarious trademark infringement, (2) false representation and (3) dilution, all under the Lanham Act, 15 U.S.C. § 1051, as well common law unfair competition.

In its Prayer for Relief, GEICO seeks preliminary and permanent injunctions barring Google from (1) selling the GEICO marks or confusingly similar terms for use in defendant's advertising program, (2) continuing to display third parties' advertisements alongside the results of searches that use GEICO's marks or confusingly similar terms as keywords and (3) making any use of the GEICO marks and/or confusingly similar terms unless expressly authorized by GEICO.  Plaintiff also seeks actual and treble damages and attorneys' fees pursuant to the Lanham Act, 15 U.S.C. § 1117, actual and punitive damages under Virginia common

_____

Later, the Court denied defendant's Motion for Summary Judgment, which argued that Google's use of GEICO's marks does not create a likelihood of confusion, because such a highly factual question is inappropriate for resolution on summary judgment.  See, e.g., National Fed'n of the Blind, Inc. v. Loompanics Enters., Inc., 936 F. Supp. 1232, 1241 (D. Md. 1996)(citing Country Floors, Inc. v. P'ship of Gepner & Ford, 930 F.2d 1056, 1062-63 (3d Cir. 1991)).

[2] The Complaint alleges, and defendant does not dispute, that plaintiff has obtained federal trademark registration for "GEICO" and "GEICO DIRECT."

law, and actual and treble damages and attorneys' fees under Va. Code § 18.2-500.

At the conclusion of plaintiff's evidence, defendant moved for Judgment as a Matter of Law under Fed. R. Civ. P. 52(c).  As stated in open court, the Court found that GEICO did not produce sufficient evidence to establish that the mere use by Google of the GEICO trademark as a search term or keyword, even in the context of Google's advertising program, violates either the Lanham Act or Virginia common law.  The Court also found that GEICO failed to produce sufficient evidence to establish that advertisements that do not reference GEICO's trademarks in their text or headings violate the Lanham Act, even though Google's advertising program enables those ads to appear when a user searches on GEICO's trademarks.  However, the Court did find that GEICO presented sufficient evidence to survive defendant's Motion on the narrow issue of whether advertisements that appear when a user searches on GEICO's trademarks and do reference those marks in their headings or text violate the Lanham Act.[3]

After the Court reached this conclusion, defendant represented that it had no evidence regarding whether such advertisements generate a likelihood of confusion.  Upon that

---

[3] Those advertisements appeared before Google began barring such use of GEICO's trademark and may have continued to slip through Google's screening system since the ban took effect.

concession, the Court found that the use of GIECO's trademarks in the heading or text of advertisements that appear when a user searches on "GEICO" does violate the Lanham Act, leaving as the only remaining issues in the case whether Google is liable for such violations and, if so, the measure of damages.[4]  Having announced these findings in open court, the Court adjourned the trial until further notice to issue a more detailed explanation of its ruling and to allow the parties time to attempt to resolve the remaining issues.

II.  Background

The facts produced at trial establish that GEICO is among the nation's leading providers of insurance, most notably car insurance.  GEICO has positioned itself as a low-cost insurance provider and, of particular importance to this action, employs a business model by which customers can only receive GEICO rate quotes directly from the company, either by phone or online through GEICO's Web site.  The company estimates that roughly 40% of its business is now Internet-driven, and that number is rising.

Defendant Google operates a widely used Internet search engine through which consumers can search for, among other things, Web sites offering products and services.  A user can

---

[4] Whether the advertisers themselves violated the Lanham Act is not before the Court because the advertisers are not parties to this action.

search on general terms, such as "auto insurance," or more
specific keywords, such as "GEICO."  The search engine compares
the search terms entered by a user with databases of Web sites
and generates a listing of the sites matching those terms.  The
results of these searches are known as "organic listings."  In
addition, through its "Adwords" advertising program, Google sells
the opportunity to have advertisements appear alongside the
organic listings.  In the Google system, such advertisements
appear as "Sponsored Links" to the right of the organic search
results.  Although at one time Google prevented advertisers from
using this system to place their ads next to the organic listings
associated with trademarked terms, such as "GEICO," defendant now
allows this practice.[5]

Plaintiff alleges that by selling this opportunity to
advertisers, defendant (1) directly violates the Lanham Act by
using "GEICO" as a keyword to place related Sponsored Links

_____

[5] Conversely, Google has always allowed trademark holders to
request that their trademarks not appear in Sponsored Links'
headings or text.  Thus, one point of dispute regarding Google's
potential damages exposure, should GEICO prevail on the remaining
liability issue, concerns when GEICO first effectively requested
that its marks be blocked in this fashion and whether Google
responded appropriately.
    That dispute involves the effect of a number of
communications exchanged between the parties in 2002 and 2003 and
the sufficiency of Google's past and current efforts at policing
violations of the ban on advertisers using GEICO's marks in the
headings and text of their ads.  Because these issues are
relevant to Google's potential liability for damages, not to
whether the use of GEICO's marks violated the Lanham Act, they
will not be addressed further in this Opinion.

alongside organic results in a manner that is likely to confuse
consumers as to the source, affiliation or sponsorship of those
links and (2) contributes to third parties' violations of the Act
by knowingly encouraging advertisers to use GEICO's marks in the
heading or text of their ads in a manner that is likely to
confuse consumers.[6]  Specifically, GEICO maintains that because
under its business model, potential customers can get GEICO rate
quotes only directly from the company, Sponsored Links that
appear when users search on "GEICO" and that advertise other
sites' ability to provide rate quotes for car insurance, even
from unnamed insurance companies, are misleading because of the
implied association of those sites with the GEICO search term.
Defendant counters that the Internet is still governed by
traditional trademark infringement and fair competition
principles, under which placing an advertisement--especially one
that does not mention a competitor by name--next to a
competitor's own advertisement does not violate the Lanham Act.
Defendant adds that even evidence of users visiting those
Sponsored Links would not demonstrate that the advertisements are

---

[6] The Complaint also alleges a common law claim of unfair
competition.  The elements of trademark infringement and unfair
competition under the Lanham Act are identical to the elements of
unfair competition under Virginia state law.  See Lone Star
Steakhouse & Saloon v. Alpha of Va., 43 F.3d 922, 930 n.10 (4th
Cir. 1995).  Accordingly, this Opinion's discussion of the Lanham
Act claims applies equally to plaintiff's unfair competition
claim.

necessarily misleading because potential customers frequently
shop around and compare brands on their own, even if GEICO's
policy precludes them from comparing GEICO's rates on the
advertisers' sites.

III. Discussion

A.   Fed. R. Civ. P. 52(c)

During a trial without a jury, after a party has been fully
heard on an issue, the court may enter judgment as a matter of
law with regard to any claim or defense that "cannot under
controlling law be maintained or defeated without a favorable
ruling on that issue."  Fed. R. Civ. P. 52(c).  The court's
finding must be supported by findings of fact and conclusions of
law, which may be set forth either in open court or in a
subsequent memorandum opinion.  Fed. R. Civ. P. 52(a).

B.   The Lanham Act

Under the Lanham Act, a plaintiff alleging trademark
infringement and unfair competition must show 1) that it
possesses a mark, 2) that the defendant "used" the mark, 3) that
the defendant's use of the mark occurred "in commerce," 4) that
the defendant used the mark "in connection with the sale,
offering for sale, distribution, or advertising" of goods and/or
services and 5) that the defendant used the mark in a manner
likely to confuse customers.  15 U.S.C. §§ 1114, 1125(a); People
for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359,

364 (4th Cir. 2001) (internal quotations omitted).  As a threshold matter, as noted above, defendant does not dispute that plaintiff possesses the marks at issue--"GEICO" and "GEICO DIRECT."

      1.   <u>Trademark Use "in Commerce" and "in Connection with the Sale, Offering for Sale, Distribution, or Advertising" of Goods and/or Services</u>

In a previous Memorandum Opinion addressing defendant's Motion to Dismiss, the Court found that plaintiff had sufficiently alleged that defendant "uses" GEICO's trademarks for purposes of the Lanham Act by allowing advertisers to pay to have their ads appear next to the organic listings that result when the marks are entered as search terms.  <u>GEICO</u>, 330 F. Supp. 2d at 704.  The Court also found that plaintiff had sufficiently alleged that such use was "in commerce" and "in connection with the sale, offering for sale, distribution, or advertising of goods and services," rejecting defendant's argument that the marks were used only in defendant's computer coding and that such an invisible process could not constitute use under the Act.  <u>Id.</u> at 704-05.  As such, the Court denied defendant's Motion To Dismiss because if the facts alleged in the Complaint were true, defendant could be liable, either directly or indirectly, for its use of plaintiff's trademarks to sell advertising and to place that advertising, labeled as Sponsored Links, alongside the

8

organic listings resulting from searches on those marks.  Id. at 704.

The Court, however, emphasized that its finding that Google uses the GEICO marks in commerce and "in connection with the sale, offering for sale, distribution, or advertising" of goods or services does not, without more, establish that defendant has violated or continues to violate the Lanham Act.[7]  Id.  Rather, plaintiff was required to prove at trial that defendant's use results, or at one time resulted, in a likelihood of confusion.

2. Likelihood of Confusion

a.   The Applicable Standard

To establish a likelihood of confusion, a plaintiff must prove that the defendant's use of the plaintiff's trademark is "likely to confuse an 'ordinary consumer' as to the source or sponsorship of the goods."  PETA, 263 F.3d at 366.  Of particular relevance to this action, in determining whether a likelihood of confusion exists, a court must consider the defendant's use of the mark in its entirety, not in isolation.  See id.  The Fourth

---

[7] The Court found support for this distinction in McCarthy on Trademarks and Unfair Competition:

> "[W]here keyword placement of . . . advertising is being sold, the portals and search engines are taking advantage of the drawing power and goodwill of these famous marks. The question is whether this activity is fair competition or whether it is a form of unfair free riding on the fame of well-known marks."

GEICO, 330 F. Supp. 2d at 704 (quoting J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 25:70.1 (2004)).

Circuit has adopted a list of seven factors to guide courts in this analysis: (1) the strength or distinctiveness of the plaintiff's mark, (2) the similarity of the two marks, (3) the similarity of the goods and services that the two marks identify, (4) the similarity of the facilities that the two parties use in their businesses, (5) the similarity of the two parties' advertising, (6) the defendant's intent in adopting the same or similar mark and (7) the existence of actual confusion.  Lone Star, 43 F.3d at 933.  However, the Fourth Circuit has emphasized that likelihood of confusion is a highly factual issue, the assessment of which depends largely on the particular circumstances of each case, see Petro Stopping Centers, L.P. v. James River Petroleum, Inc., 130 F.3d 88, 92 (4th Cir. 1997), that not all of the factors are relevant in every case, and that the likelihood of confusion standard does not require that a plaintiff prove actual confusion.  See Lone Star, 43 F.3d at 933. In addition, other factors, such as the sophistication of the consuming public or the quality of the defendant's product, may be relevant to a given set of facts.  Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 464-65 (4th Cir. 1996).

Recognizing that these traditional factors are not really applicable in this case, which does not involve confusion based on a defendant's use of a mark identical or similar to a known mark to sell its own products, plaintiff argues that defendant's

use of its trademark causes "initial interest" confusion.  In the
Internet context, this term describes the distraction or
diversion of a potential customer from the Web site he was
initially seeking to another site, based on the user's belief
that the second site is associated with the one he originally
sought.  See Brookfield Communications, Inc. v. West Coast
Entertainment Corp., 174 F.3d 1036, 1064 (9th Cir. 1999); Bihari
v. Gross, 119 F. Supp. 2d 309, 320-21 (S.D.N.Y. 2000); see also
PETA, 263 F.3d at 366 (discussing the appropriate boundaries of
initial interest confusion with regard to parody).  Inherent in
this concept is the risk that the user will be satisfied with the
second site or sufficiently distracted that he will not arrive at
or return to the site for which he was originally searching.
Bihari, 119 F. Supp. 2d at 320-21.  The risk of losing customers
who are initially confused is lessened on the Internet as
compared, for example, to when a billboard employs initial
interest confusion to entice a customer down the wrong road
because a customer can retrace his steps almost instantaneously
online.  See id. at 320 n.15.  However, pointing to the unique
nature of the car insurance business, GEICO contends that because
customers seek an average of fewer than two quotes before
purchasing car insurance, even in the Internet context the
company loses significant business from the alleged initial
confusion that misdirects potential customers who originally

11

searched on "GEICO" to sites where they can obtain other companies' quotes but not GEICO's.

To prove likelihood or absence of confusion, initial or otherwise, parties commonly introduce the results of customer or potential customer surveys.  See IDV North America, Inc. v. S&M Brands, Inc., 26 F. Supp. 2d 815, 829 (E.D. Va. 1998).  Results indicating that a high percentage of customers are likely to be confused can establish this element of a Lanham Act violation, while results revealing a low potential for confusion can negate such allegations.[8]  Id.  In assessing a survey's probative value, a court must evaluate not only the percentages of respondents who appeared likely to be confused but also the accuracy and reliability of the survey design and method.  See id. at 829-32.  Even if a survey is flawed in some respects, it can still support a finding of liability if the results reveal that an overwhelming percentage of respondents demonstrated confusion.  See Sara Lee, 81 F.3d 455, 466-67.

_____

    [8] The Fourth Circuit has noted that "survey evidence clearly favors the defendant when it demonstrates a level of confusion much below ten percent" but that a number of courts have found actual confusion based on survey evidence indicating a ten to twelve percent rate of confusion.  See Sara Lee, 81 F.3d at 467 n.15.

b. Evidence of Confusion

(1)   GEICO's Survey Results

GEICO introduced an expert survey that it claimed revealed a strong likelihood of confusion caused by Google's Adwords program and the Sponsored Links that the program places alongside the organic results of searches on the GEICO trademark.[9]  The survey was designed and evaluated by a professor of marketing at American University's Kogod School of Business, who attempted to measure initial interest confusion experienced by potential customers[10] by asking them to enter "GEICO" into the Google search engine and then view a results page that showed five Sponsored Links alongside the organic listings.[11]  The survey

_____

[9] Plaintiff tested confusion with regard to the "GEICO" mark but advances the same arguments with regard to "GEICO DIRECT."

This survey represents GEICO's only evidence of likelihood of confusion.  Therefore, GEICO's ability to survive defendant's Motion depends on the strength and reliability of the survey results.

[10] The survey was limited to drivers who said that they were likely to consider purchasing or renewing their auto insurance policy within the next six months and that they would use the Internet to search for providers.

[11] The professor selected this screen shot from among a number of choices provided to him by plaintiff.  The shot captured the results of a search run on "GEICO" in April 2004, which was before Google began barring advertisers from using GEICO's marks in their ad headings and text.  Plaintiff contended at trial that the use of an earlier shot was necessary to avoid having references to this action show up in the organic listings, a result that could have prejudiced participants' responses.

Defendant objected to the choice of the particular screen, arguing that it skewed the survey results by showing five Sponsored Links, when the average results page includes fewer

also tested a "control group," the members of which also searched on "GEICO" but then saw a results page on which the Sponsored Links had been changed from advertisements for car insurance quotes, most of which mentioned GEICO, to advertisements regarding NIKE athletic apparel.  After asking both groups a series of questions designed to measure the likelihood of confusion, the professor compared the degree of confusion demonstrated by those who viewed the insurance-related Sponsored Links to that demonstrated by the control group.[12]

---

advertisements.

[12] The questions asked of the participants were as follows:

1(a) If you wanted to purchase automobile insurance from GEICO, where on this page would you "click" first?

1(b) Why do you say that?

2(a) Now if you clicked on GEICO (interviewer pointed to the first of the Sponsored Links, which mentioned GEICO), what company's or companies' Web site would you expect to go to?

2(b) Why do you say that?

3(a) Do you think the company that sponsors this listing is associated or connected with any other company or companies? (If participants responded affirmatively, they were asked the following two questions.)

3(b) What company or companies are they associated or connected with?

3(c) Why do you say that? (After answering this question, participants were informed that the survey was complete.

According to the survey results, 67.6% of test group respondents expected that they would reach GEICO's Web site if they clicked on the Sponsored Links, and 69.5.% thought that the Sponsored Links were either links to GEICO's site or affiliated with GEICO in some way.[13]  In addition, 20.1% of test group respondents said that to purchase GEICO insurance they would click first on one of the Sponsored Links.[14]  From these results, the professor concluded that a substantial percentage of potential GEICO customers perceived the Sponsored Links as being associated with GEICO and therefore were confused about whether they could get GEICO information or rate quotes from those links.

(2)  <u>Survey Weaknesses</u>

The Court found that defendant's cross examination of the professor revealed a number of weaknesses in GEICO's survey evidence.  First, the control did not successfully demonstrate the source of the test group's confusion.  As the survey expert admitted, an effective control should have removed from the page viewed by the test group the allegedly infringing elements for which GEICO wanted to measure confusion, such as the Sponsored

---

[13] These figures are based on an average of the confusion registered with regard to each of the five Sponsored Links that appeared on the Web page.

[14] Defendant and the Court noted that many of those respondents explained that they would click first on one of the Sponsored Links to purchase insurance to save money or to get price quotes.  These explanations belie the conclusion that they were confused about GEICO.

Links mentioning GEICO, while keeping the other elements as constant as possible.  This would have allowed the evaluator to subtract any degree of confusion expressed by the control group from that expressed by the test group, with the resulting difference representing the confusion attributable to the eliminated elements--similar to the manner in which medical researchers subtract out the "placebo effect" of a drug or procedure under examination.  However, the survey's control, which replaced the insurance-related Sponsored Links that appeared when respondents searched on "GEICO" with Sponsored links related to NIKE athletic apparel, did not function as an accurate measure of the confusion caused by non-infringing elements of the screen shot.  As a threshold matter, the control retained the use of "GEICO" as a keyword, which itself was alleged to be a source of confusion.  Further, instead of removing only the references to GEICO in the Sponsored Links, which would have measured whether the use of the trademarked keyword to place relevant Sponsored Links or the appearance of the mark in the ads was responsible for respondents' confusion, the survey removed all references to car insurance and replaced them with clearly unrelated NIKE ads.  Thus, the control did not reveal which aspects of the insurance-related Sponsored Links caused respondents' confusion--the use of GEICO's mark in the ads

16

or the ads' mere reference to insurance.[15]  By not examining this
more subtle distinction, the survey did not produce evidence that
the use of "GEICO" as a keyword, without more, causes respondents
to be confused by the appearance of the Sponsored Links.

Second, the survey design introduced "demand effects" and
"order effects" that could have tainted respondents' answers that
appeared to indicate confusion.  A demand effect results when the
interviewer's questions or other elements of the survey design
influence participants' responses by suggesting what the
"correct" answers might be or by implying associations that might
not otherwise occur to participants.  An order effect results
when a participant's answer to one question affects his answers
to subsequent questions.  For obvious reasons, both effects can
significantly bias the survey results.  In this instance, as
noted above, the interviewers repeatedly questioned respondents
about their behavior and assumptions with regard to GEICO and
obtaining GEICO quotes.  Responses to subsequent questions, such
as whether the participant thought the Sponsored Links were

---

[15] No respondent in the control group expressed confusion
when asked whether clicking on one of the NIKE Sponsored Links
would direct him to GEICO's Web site.  The professor thus
concluded that respondents' confusion in the test group resulted
from "the positioning, heading *and/or* content" in the insurance-
related ads. (Expert Report at 8)(emphasis added).
    This absence of confusion when faced with NIKE ads
alongside organic listings for "GEICO" also refutes the
allegation that the use of the trademark as a keyword, without
more, causes a likelihood of confusion.

affiliated with any company, easily could have been influenced by the earlier questions about GEICO, making the participant more likely to assume that "GEICO" was the right answer or what the interviewer wanted to hear.  This demand effect, along with the order effect, also undercut the assessment of confusion regarding the one insurance-related Sponsored Link shown to the test group that did not mention GEICO's mark in its heading or text.  Of the five Sponsored Links listed, only the last one did not refer to GEICO in its heading or text.  By the time respondents considered this ad, they had already seen the four others that did contain the GEICO mark, calling into question whether they would have expressed similar confusion if faced only with insurance-related ads that appeared next to the organic results for "GEICO" but did not mention the mark itself.

Third, discrepancies between the Web page selected to be shown to the survey particpants and the actual pages users are likely to see when searching on "GEICO" further weakened the reliability of the results.  As discussed above, the page chosen included more Sponsored Links than the average Google results page.  In addition, and possibly more important to an accurate assessment of users' confusion, the overall appearance of the outdated screen shot shown to survey participants differed markedly from the Google results page that a user would encounter in running a real search.  Most notable, in the survey shot, the

18

Sponsored Links were closer on the page to the organic listings than on Google's actual search results pages.[16]  In the Court's view, the proximity of the Sponsored Links in the survey page increased confusion regarding the difference between the two lists of links and was suggestive of affiliations between the organic listings and the Sponsored Links.  Especially when considered along with the other weaknesses in the survey, these differences give the Court serious doubts about the accuracy of the survey results' reflection of actual users' experiences with and reactions to the Sponsored Links.

   c. <u>Conclusions from Evidence of Confusion</u>

Based on the above analysis, the Court finds that plaintiff has failed to establish a likelihood of confusion stemming from Google's use of GEICO's trademark as a keyword and has not produced sufficient evidence to proceed on the question of whether the Sponsored Links that do not reference GEICO's marks in their headings or text create a sufficient likelihood of confusion to violate either the Lanham Act or Virginia common law.

Despite the many flaws in its design, the survey's results were sufficient to establish a likelihood of confusion regarding

---

[16] Further complicating the analysis, certain Web browsers may significantly change the look of the pages seen by real users.  For example, Internet Explorer removes shading and dividers.

those Sponsored Links in which the trademark GEICO appears either in the heading or text of the ad. Based on this finding, Google may be liable for trademark infringement for the time period before it began blocking such usage or for such ads that have slipped or continue to slip through Google's system for blocking the appearance of GEICO's mark in Sponsored Links. For, despite the flaws in the survey, the extremely high percentages of respondents who experienced some degree of confusion when viewing such ads provides sufficient evidence to survive defendant's Motion for Judgment. Further, having been advised by defendant that it has no evidence to introduce on this last issue, the Court finds that plaintiff has established a likelihood of confusion, and therefore a violation of the Lanham Act, solely with regard to those Sponsored Links that use GEICO's trademarks in their headings or text.

Aware of the importance of these issues to the ongoing evolution of Internet business practices and to the application of traditional trademark principles to this new medium, the Court emphasizes that its ruling applies only to the specific facts of this case, which include the unique business model employed by plaintiff and the specific design of defendant's advertising program and search results pages. In addition, the Court has not addressed several remaining legal issues, including whether Google itself is liable for the Lanham Act violations resulting

from advertisers' use of GEICO's trademarks in the headings and
text of their Sponsored Links, as accomplished through Google's
Adwords program.  That significant issue remains to be resolved,
either through an agreement by the parties or in a continuation
of the trial.  Also unresolved is the timeframe during which
violations occurred and the measure of damages or other relief to
which plaintiff may be entitled if Google were to be found
liable.

III. <u>Conclusion</u>

Accordingly, for the reasons stated in open court, as
amplified by this Memorandum Opinion, defendant's Motion for
Judgment pursuant to Fed. R. Civ. P. 52(c) has been granted in
part and denied in part.  The Court has temporarily stayed this
civil action to give the parties time to consider these rulings
and determine whether they can resolve the remaining issues of
liability and damages.  An appropriate Order will issue.

The Clerk is directed to forward copies of this Memorandum
Opinion to counsel of record.

Entered this 8th day of August, 2005.


_____/s/_____
Leonie M. Brinkema
United States District Judge

Alexandria, Virginia

21